ELY, Appellant, v. COONTZ, et al.

Division Two, March 11, 1902.

1. **Appeals:** DEFECTIVE ABSTRACT: RESPONDENT'S DUTY. It is not the duty of respondent to go to the expense and labor of abstracting the record, which appellant has failed to do, in order to advise the court of the points in dispute and the material matters in the case.

2. **Trial by Jury:** CONSTITUTIONAL EXTENSION: EQUITY. The Constitution does not extend the right of trial by jury, but simply secures that right in the class of cases in which it existed, as a matter of right, before its adoption. Trial by jury in equity suits did not exist at common law and never as a matter of right in this State, and, hence, the Constitution did not guarantee to either party a right of trial by jury in equity cases.

3. ———: EQUITY SUIT: PARTNERSHIP ACCOUNTING. Neither party is entitled to a jury in a partnership accounting. It is an equity suit.

4. **Partnership Settlement:** ACQUIESCENCE: FRAUD. Where the preponderance of the evidence is that there was a complete and final settlement of all the accounts and debts of a firm, and all parties acquiesced therein for two years or more, a court of equity will not permit that settlement to be set aside (no fraud in securing the settlement being alleged) on the petition of a stockholder who alleges the firm has or had a lot of unpaid notes and other manufactured goods, all of which were considered worthless when that settlement was made.

Appeal from Audrain Circuit Court.—*Hon. E. M. Hughes,* Judge.

AFFIRMED.

*W. W. Botts* and *Edmonston & Cullen* for appellant.

(1) Plaintiff was entitled to a trial by jury for the reason that the pleadings tendered an issue of fact, pure and simple. (2) There could be no settlement of the affairs of the partnership without taking into account the rights and liabilities of all the partners. (3) The evidence shows that there has not been a settlement of all the affairs of the partnership. (4) Assertions by parties to a settlement that "they got together and settled up all the affairs of the partnership" is a conclusion and has no probative force.

*Geo. Robertson* for respondents.

(1) The plaintiff was not entitled to a jury. Sec. 692, R. S. 1899; Bray v. Thacher, 28 Mo. 129; Gay v. Ihm, 69 Mo. 584; Snell v. Harrison, 83 Mo. 651; Bronson v. Wanzer, 86 Mo. 408; Nelson v. Betz, 21 Mo. App. 219; Hunter v. Whitehead, 42 Mo. 524; Durfee v. Moran, 57 Mo. 374; 3 Pom. Eq. Juris., sec. 1421. (2) The meeting had on March 7, 1895, and the adjustment of all of the differences between the partners, constituted a final settlement of the partnership. Sharpe v. Johnston, 59 Mo. 557; Silver v. Railroad, 72 Mo. 194, 5 Mo. App. 381; Rogers v. Sims, 39 Mo. App. 678. (3) Plaintiff's petition does not state a cause of action, for it does not show that anyone would be benefited by an accounting, and, therefore, the bill was properly dismissed. Rogers v. Sims, supra. (4) There is no charge of fraud or mistake in the settlement of the partnership business. If plaintiff could now have any complaint it could be exercised only by an action in equity to reopen the settlement, on the ground of mistake or fraud. Lindley on Partnership (Ewell),

star page 968; Pomroy v. Benton, 57 Mo. 531. (5) Although there may have been a mistake in the final settlement of the partnership account, yet if both parties had equal opportunity of knowing of the mistake and there was no fraud or concealment, then a court of equity in an action brought for the purpose of setting it aside will uphold the settlement. Belt v. Mehen, 2 Cal. 159; Hertz v. Clark, 46 Ga. 649. (6) Defendant's answer sets up a settlement which affords a complete defense to plaintiff's action. Lindley on Partnership (Ewell), star page 967; Silver v. Railroad, 5 Mo. App. 381.

GANTT, J.—At the September term 1897, plaintiff brought his suit in equity for a settlement and an accounting of the partnership affairs of the Vandalia Fire Brick Company, a firm composed of the plaintiff, S. D. Ely, and the defendants, C. G. Daniel, H. T. Davis, J. F. Coontz and G. H. Utterback, and engaged in the business of manufacturing fire and other brick, drain tile, and mining coal, at Vandalia in Audrain county.

This partnership, it was alleged, was formed October 24, 1890. The petition avers that said firm entered into a contract with one Stuewe to carry on said business and that arrangement with Stuewe continued until 1892 when it was dissolved; that thereupon plaintiff and defendants carried on said business until July, 1893, when said firm retired from business; that in the course of their business said firm expended large sums of money for labor and machinery and sold large quantities of said material and shipped large quantities of coal and used the plant of the Audrain Manufacturing and Coal Mining Company, a corporation of which said partners were the officers and stockholders, and used and appropriated certain funds belonging to said corporation; that said firm is indebted to said corporation for the use and occupation of its said plant; that at the time said firm retired from business there was on hand a large quantity of manufactured

goods undisposed of, the amount of which is unknown to plaintiff; that the books showing the same are in the hands of defendants; that there were on hand also certain promissory notes, to-wit, two against said Stuewe, one for $2,000, the other for $2,055.20, both of date February 1, 1892, and one on C. Dixon, of February 11, 1893, for $1,344.30, one of January 20, 1894, for $520, and another for $6,580, of February 24, 1894, all bearing interest at eight per cent per annum, and one on E. G. Burklin for $75, and various book accounts; that advancements had been made to said firm by its members from time to time, and stating the amount each partner had advanced.     Then after alleging that no settlement had been made, the petition prayed for an accounting and adjustment of said firm liabilities, and for a dissolution, and for all proper decrees, etc.

The joint answer of defendants was as follows:

"Now come all the defendants herein and for their joint answer say that it is a fact that all of the parties hereto at one time were engaged in business as partners, and say that at one time they purchased the interests of the Audrain Manufacturing and Mining Company; that said Ely owned the larger part of said interest in said company, and said company had a settlement with said partnership, which was agreed upon and satisfactory to said Ely and all parties concerned. That said partnership continued in business until July, 1893, when it sold out and transferred all of its assets to the Vandalia Coal Company, and afterwards, March 7, 1895, all of said partners except said Davis got together and had a complete settlement of said business; that for a long time prior to said sale and settlement said Davis had been dropped from said partnership by the mutual consent of all the parties concerned.     Defendants say that there are no assets of said partnership except the notes described in plaintiff's petition, which are insolvent, and so regarded by all the parties hereto, and were so regarded in said final settlement aforesaid.     Defend-

ants deny that said plaintiff was cheated or wronged in any way in any of said transactions, but on the other hand was the business manager of said partnership and knew well that in said final settlement everything was accorded to him to which he was entitled, and except as herein admitted, defendants deny each and every allegation of plaintiff's petition, and having fully answered ask to be discharged with their costs."

To which plaintiff replied as follows:

"Now comes the plaintiff herein and for reply to defendant's answer says that he denies that the partnership transferred all its assets to the Vandalia Coal Company; denies that the defendant Davis was ever dropped from said partnership by mutual consent by all parties concerned; denies that the members of said partnership or any of them ever met and had a complete settlement of said business; denies that the notes described in plaintiff's petition are insolvent, and denies that they are so regarded by the parties, either now or at the time the alleged final settlement was made; and denies each and every other allegation of new matter in said answer contained; and having fully replied prays for the relief asked for in his original bill."

When the cause was called for trial "the parties announced themselves ready for trial upon the issue of settlement of the partnership affairs as averred in the answer, whereupon plaintiff requested a jury to try this issue, which the court declined to grant and refused to call a jury, holding that as this is an equity case the parties have no right to demand a jury to try the issue herein;" to which ruling plaintiff duly excepted at the time.

The abstract of appellant is exceedingly unsatisfactory, omitting, as it does, a statement of the settlement which was offered and read in evidence, and which the defendants testified was a final settlement of the partnership matters and other material evidence.   These have been supplied by the defend-

ants in their abstract, and by convenient references to the transcript on file.

We can not permit this negligent practice to pass without our disapproval. Our rules are clear and explicit as to the duty of appellants in preparing abstracts and briefs. It is not the duty of respondents to go to the expense and labor of abstracting the record as they have done in this case in order to advise this court of the points in dispute and the material matters in the record.

I. The first point advanced by plaintiff, that the court erred in denying him a jury, is clearly without merit. This is a suit in equity in which a trial by jury did not exist at common law and never has as a matter of right in this State, and though the chancellor may in his discretion submit certain issues in such a cause to a jury he is not bound by their verdict. [Gay v. Ihm, 69 Mo. 584; Snell v. Harrison, 83 Mo. 651.] This constitutional guaranty of the right of trial by jury secures that right in the class of cases in which it existed as a matter of right before the adoption of the Constitution; it does not extend it. [Cooley on Const. Lim., 504, and cases there cited; Shepard v. Bank, 15 Mo. mar. page 150; Edwardson v. Garnhart, 56 Mo. 81; Ice Co. v. Tamm, 138 Mo. 385.] In this case plaintiff seeks an accounting of the partnership affairs of the Vandalia Fire Brick Company, and the jurisdiction of courts of equity in such suits is exclusive, as are their remedies of dissolution and the adjustment of the firm affairs between the partners themselves. The court committed no error in denying a jury. Having jurisdiction of the case in equity, it had it for all purposes.

II. The issue was settlement or no settlement.

On the part of defendants, C. G. Daniel, J. F. Coontz, G. H. Utterback, three of the defendants, testified that on March 7, 1895, Mr. Ely, the plaintiff, and themselves had a meeting in the rear office of the Bank at Vandalia, for the purpose of set-

tling the entire business between them, not only of the Vandalia
Fire Brick Company, but of the Audrain Manufacturing and
Mining Company, and their individual differences growing out
of those concerns as well.    The witness Daniel produced and
testified that a balance sheet which the defendants read in
evidence was the final adjustment of the affairs of both of those
concerns and that Mr. Ely was requested to present everything
he had against them at that time.    Ely had been the managing
officer, both of the corporation, and of the firm which subse-
quently, by mutual agreement, had taken over the affairs of
the corporation.    Sometime after they had suspended all active
operations in 1893, Mr. Ely had removed to St. Louis, and
they wrote him to come to Vandalia to settle up these matters.
He came on March 7, 1895, and they got together.    There
were present Mr. Ely, Coontz, Utterback and Daniel. Daniel
testified they talked over the whole matter and Mr. Ely was
called upon to present every claim he had against the concern;
that they wanted everything brought out and adjusted.    At
that time he says:   "We paid Mr. Ely on the Dixon note
$1,577.75.    We paid Ely for labor $458.65.    We paid to
the Vandalia Banking Association $5,995, and also paid the
same bank $723.    We paid an overdraft at the bank of $16.95.
We paid Mr. Utterback $342.60.    Our total indebtedness was
$9,113.79.    We had five notes amounting to $3,685.    The
amount paid on the Dixon note was $300, the Vandalia Coal
Company paid a balance of $520, and that left us a balance
of indebtedness of $4,608.79.    This was divided by four,
making the indebtedness of each, Ely, Utterback, Coontz and
myself, $1,152.20, so we four paid this $4,608.79, which
made one thousand one hundred and fifty-two dollars and
some cents each.    We arranged to pay it that night, and it
was really paid the next morning.    This was the final set-
tlement.    This memorandum from which I read was made at
the time.    At this meeting Mr. Ely (as all were) was called
on to present every claim that he had against the concern.

We talked the matter over fully before and afterwards, and we wanted every solitary thing that concern owed to be brought out there at that meeting and adjusted. We talked it over. We talked over the settlement and were glad that the matter had been adjusted—that we had been afraid we might get into court on account of the unequal relations we bore to it. Everything that Mr. Ely had was presented there and settled. In the settlement there was going to Mr. Utterback, $342. We had there the Stuewe notes and the Dixon notes, and also an open account against Bucklin for something over one hundred dollars. All of these debtors were totally insolvent. We counted up every dollar of indebtedness and took into consideration everything owing to us. Every dollar of the indebtedness has been paid. We adjusted not only the debts of both concerns, but we adjusted everything between ourselves. Mr. Davis had in the meantime become insolvent and was unable to pay his part, and we took that up as our indebtedness and adjusted it between ourselves. We considered also the shares owned by other parties, and, as they had not joined in the partnership, we included them also in our settlement. Mr. Ely was the manager and drew a salary all of the time we were in business and had charge of the financial business of the concern. We sold out to the Vandalia Coal Company June 17, 1893, and had our settlement among ourselves on March 7, 1895."

J. F. Coontz, on the part of defendant, testified as follows: "I live in Vandalia, Missouri. I was present at the meeting on March 7, 1895. Mr. Ely, Mr. Daniel, Mr. Utterback and myself met at the bank to have a final and complete settlement. We got together. The bank had a claim against us, and I think there was some paid off on the Locke note (the balance on the note owed by Davis). Mr. Ely had a claim against us, and Mr. Utterback had paid in some money and we owed him. We just met that time to have a final and complete settlement of all of the matters of the concern. Mr.

Daniel did the figuring. Mr. Ely made a claim for a note and for a bank account. Everybody was called on to present his claim, and everybody did, and everything was paid. Mr. Utterback had paid in more money than some of us, and we paid him back. We talked at the meeting that the purpose of it was to settle up everything between us, and this we did. No account was presented that was not settled."

G. H. Utterback, on the part of the defendant, testified as follows: "I was at the meeting on March 7, 1895, of Mr. Ely, Mr. Daniel, Mr. Coontz and myself. We met there for a settlement, and we made a settlement. Mr. Ely presented an account for labor, and there was no account nor claim that was presented that was not settled. The concern owed me some money, and it owed Ely some money, and it owed the bank, which Mr. Daniel represented, some money. We first ascertained what we had to pay with, and then made up the balance among ourselves, and then adjusted our debts among ourselves and paid the balance. Mr. Davis had failed to pay his part, and we took that up as our loss and paid it. There were five of us at first, but Mr. Davis dropped out and we had to pay his indebtedness."

J. R. Bratton, on the part of the defendant, testified as follows: "On March 7, 1895, when this final settlement took place between the plaintiff and defendants, there was some old stock on hands belonging to the old concern, but it was worthless."

*Per contra*, the plaintiff testified to the contract with Stuewe, his failure, the termination of that contract, and the taking of Stuewe's notes, and that four of the stockholders, Mr. Ely, Coontz, Daniel and Utterback paid about $7,800 at that time as four of the stockholders were insolvent and the others said that plaintiff would have to pay in proportion to the shares he owned or nine-sixteenths. He did not think he ought to have to do so but any way they paid what they owed the bank in that proportion. Having disposed of Stuewe, they

then made a contract with Dixon, and they ran it with him until March, 1893. Dixon also made a failure of the business, and took his notes for the balance due. These notes were as Daniel testified as to amount. As to the March, 1895, settlement, his testimony was to the following effect:

"At the meeting on the seventh of March, 1895, we just met about like we met before and paid what we owed. I think they had it all figured up. There were no books or accounts used. We met then to pay off debts and paid them off. I was living in Mexico at the time. I think I went there for that purpose. I got their letter but I always went there the first of the month. We knew that we had met there to settle up the business of the indebtedness. We knew we were indebted to the bank and to Mr. Utterback. I told them to get the book and figure up my account. It was on the company's book. There were no other accounts brought up that I know of. Mr. Utterback had a note. I don't remember anything else. We went along and settled up our business. We were there about an hour, I think, only a short time. I don't think there was anything said about our standing accounts. I don't think there was anything said about the Audrain Manufacturing and Coal Mining Company, nor about the stock on the grounds, nor about the royalty. Mr. Davis was a member of the firm. He acted as secretary during the time Stuewe ran the plant. He was an active member on up to the time, or near the time we sold out. He got mad at me. We had a meeting and I said: 'I am not going to put up any more money,' and he got mad. That was the last business meeting we had. Davis was there and got terrible mad because I said I would not put up any more money. I never heard of his being released from the partnership, nor do I think anybody else did. On the ledger of the Vandalia Fire Brick Company there are accounts unsettled on page 6, two accounts—one for $623.50 and another for $217.50. There is a large account with a smelter company, $2,000 or $3,000;

the American Smelter Company, $1,000; this account is closed
May 15, 1895, it is for $65.75; there is an account against
Harrigan for $67.95."

The settlement or balance sheet offered and identified
by Daniel showed that on that date the company owed plain-
tiff Ely, a note of $1,577.75, and an account for labor for
$458.65, which items constituted a part of the total indebted-
ness of the firm, of $9,113.79, from which they deducted
amount paid by Vandalia Coal Company, $520, and certain
interest amounting to $3,685.00, and the amount received
from Dixon stock, $300, leaving a balance which the firm
was required to meet of $4,608.79, or $1,152.20 each, which
they all agreed was paid that day.

The great preponderance of the evidence established that
Stuewe, Dixon and Davis were all insolvent and that the other
original stockholders were also insolvent and that these four
gentlemen proceeded in their settlement and disposition of the
company's business on that assumption. It further appears
that in July, 1893, the firm who constituted the stockholders
of the Audrain Manufacturing and Mining Company sold
all the assets, as did Dixon any interest he had, to the Van-
dalia Coal Company, for $7,500 cash. This money they all
agree went to liquidate the debts of the firm as far as it would
go.

This action was not commenced until about two and a
half years later. Upon this evidence the circuit court found
there was a settlement and dismissed the bill.

The various heads of the plaintiff's brief may all be con-
sidered under one, namely, that the evidence did not establish
a settlement.

In weighing the testimony as to whether there was or was
not a settlement, the condition of the affairs of the firm at
the time of the alleged settlement in March, 1895, may throw
some light upon the issue. It is absolutely certain that the
firm had ceased to be a going concern for two years at least.

They had sold all of their manufacturing plant and assets except their notes and accounts. The Stuewe and Dixon notes were utterly valueless and there was not the slightest prospect of their collection by delaying a settlement with that object in view. In view of the arrangement made by this Vandalia Fire Brick Company to take over the Audrain Manufacturing and Coal Company, of which they were the only responsible stockholders, and in view of the further fact that plaintiff and defendants assumed all of its corporate liabilities and paid them, it is idle to suggest that company's affairs as a reason for not settling the partnership affairs. The parties to this suit sold all the corporate assets for $7,500 and applied the money to the payment of the debts of that concern. The claim that there was some unsold stock on the yards when they sold out to the Vandalia Coal Company, is disposed of by Bratton's evidence that it was of no value.

Now, plaintiff testifies that he received defendant's letters to come to Vandalia to settle, and that he went there. He admits they got together, allowed his claims; ascertained the outstanding debts to the bank, Utterback and himself; took into account all the available assets; applied them in reduction of the liabilities, and thereupon divided the balance pro rata and each assumed and paid his own proportionate share.

Certainly it would seem there was nothing left to settle. Now Coontz, Daniel and Utterback all testify that they met to make a final settlement and took an account of assets and liabilities and everybody was called on to present his claims, and every one did. They adjusted everything that was brought forward. There is no charge of fraud made in the petition.

This settlement was understood by three out of the four present as a final adjustment and Mr. Ely does not testify that he objected to anything that was done but says it was not a final settlement but a mere liquidation of what they owed. All parties treated it as a settlement for more than two years, when for the first time plaintiff began to express dissatisfac-

tion with the arrangement. Now, while Mr. Ely testified to his ignorance of the way the accounts were kept, it must be borne in mind that he was the general manager all the time and the same opportunity was open to him before he settled to learn the condition of the firm as afterwards. While the other three partners testify positively and with particularity as to the items that entered into the settlement and produce the balance sheet according to which they paid their several shares of the debts, Mr. Ely simply says he "don't think there was anything said about outstanding accounts;" that he don't think anything was said about the Audrain Manufacturing and Mining Company; or about the stock on the grounds or the royalty," but he does say "we went along and settled up our business."

In these circumstances we think the circuit court was justified in finding there had been a final settlement and in the absence of a specific charge of fraud there was no reason for disturbing it.

As to Davis, it is immaterial whether they agreed to let him out or not as the evidence shows he was insolvent and they all recognized that fact, as Mr. Ely did not object to being charged with his pro rata share of Davis's liability.

After a careful examination of the record we find no ground for disturbing the judgment of the circuit court and it is accordingly affirmed. All concur.